CITIZENS BANK & TRUST CO. *v.* HINKLE, ADMINISTRATOR.

Opinion delivered November 13, 1916.

1. ACCOUNT STATED—ACCOUNT WITH BANK—NOTICE OF DISPUTE.—Deceased had certain funds on deposit in appellant bank, and after his death it was suspected that the cashier was misappropriating some of the funds belonging to deceased's widow. The bank was requested to furnish a statement of the account, which it did in February, 1915; an action was brought against the bank in September, 1915, in which the peculations of the cashier were set out. In the meantime the bank's attorney was notified that the widow disputed the correctness of the statement furnished by the bank. *Held*, the account was not an account stated, and that the action against the bank could be maintained.

2. BANKS AND BANKING—RELATION TO DEPOSITOR—DUTY OF DEPOSITOR TO EXAMINE PASS BOOK.—The relation between a bank and its depositor is that of debtor and creditor, and the pass book of a depositor, where balanced and returned, may become an account stated, and binding upon both the bank and the depositor as such.

3. BANKS AND BANKING—ACCOUNT WITH DEPOSITOR—ACCOUNT STATED.—Where the cashier of a bank appropriated the funds deposited by a

depositor, and credited the same to his account, the bank will be liable therefor, unless the depositor, with knowledge of such improper charges, by silence ratified and adopted the same, or having received a statement from the bank, with vouchers representing such charges, the depositor did not in a reasonable time notify the bank that they were improper, and the bank was injured by such failure.

4. BANKS AND BANKING—RELATION TO DEPOSITOR—IMPROPER CHARGES —FAILURE TO RENDER STATEMENTS.—A depositor cannot be held to have ratified improper charges against his account, in the absence of any knowledge of such facts or in the absence of a statement furnished to him by the bank, showing such improper charges; and no duty rests upon him to take any action until some notice of such improper charges is brought to his attention.

5. BANKS AND BANKING—DEPOSIT OF PRESIDENT—DUTY OF BANK.— A bank owes to its president, where he is a depositor, the same duty with respect to his individual deposit that it owes to any other depositor.

Appeal from Independence Circuit Court; *T. D. Crawford*, Special Judge; affirmed.

*Brundidge & Neelly* and *J. W. & J. W. House, Jr.*, for appellant.

1. The bank books were balanced from time to time and delivered to appellees with all checks and vouchers, and it was the duty of appellees to examine them, thus discovering any shortage, and notify the bank, so it could protect itself; but the failure to so examine and notify the bank relieved it from liability, as upon an account stated.

2. Paxton was appellee's agent and was authorized to sign checks and acted within the scope of his authority and under the circumstances the bank was not liable. These are the bank's defenses and the instructions were based upon these theories. It was error to give instruction No. 5 for plaintiffs. The vice is the use of the words, "With knowledge of the improper charges." 117 U. S. 96; 56 S. E. 152; 71 S. W. 612; 74 Am. St. 672-4; 97 N. W. 380; 87 N. E. 740-4; 63 *Id.* 969, 973; 27 Am. St. 82; 101 N. E. 872; 109 Va. 530; 57 Ark. 142; 58 Atl. 305; 92 Cal. 14; 14 L. R. A. 320; 69 Atl. 609; 87 N. E. 740; 77 S. W. 1002. All these and others show that it is the duty of the depositor to make reason-

able examination of pass books and statements and notify the bank, and if he neglects.and the bank suffers it is not liable.

3. Other instructions also are objectionable and conflicting. The knowledge of Thomas cannot be imputed to the bank. 154 S. W. 512; 65 Ark. 543; 100 Fed. 705; 122 Mo. 339; 134 S. W. 165; 180 Fed. 686; 59 Am. St. 650.

4. Where a principal by entrusting his money to the agent enables him to do the wrong the principal, rather than the bank, should suffer. Michie on Banks & Banking, 964; 2 N. Y. Sup. (2 Hall) 589; 57 Ga. 283; 191 Fed. 566; 86 Pa. 84; 97 N. W. 380. Thomas was appellee's agent.

*Hal. L. Norwood, Ernest Neill* and *Moore, Smith, Moore & Trieber,* for appellees.

1. . The bank became debtor to appellees by virtue of the relation to bank as depositors, and the bank being accountable for the money deposited therein must show that the charges made against the accounts were made with their authority. The burden was on it. 3 Ruling Case Law, § 149; 56 Ark. 508; 187 S. W. 674. The charges against appellee's accounts were unauthorized and unknown.

2. The bank benefited by these charges and is liable. 127 N. W. 522; 95 Fed. 87; 82 Conn. 8; 104 U. S. 54; 72 N. Y. 286; 147 Mass. 268; 68 Ark. 299; 69 *Id.* 48; 68 *Id.* 71; Morse on Banks, etc. (3 Ed.), § 317; Michie on Banks & Banking, 966; 14 L. R. A. 234; 104 Tex. 379; 127 N. W. 522; 2 L. R. A. (N. S.) 993.

3. The unlawful charges by Thomas were the acts of an officer of the bank and not of the customer. The bank is charged with notice of the acts of its cashier and cannot escape liability except by showing authority from the depositor. 95 Fed. 87; 72 Atl. 150.

4. Knowledge of the unauthorized acts is imputed to the bank. 2 L. R. A. (N. S.) 993; 60 Fed. 79; 177 S. W. 72; 118 Ill. 625; 127 N. W. 522; 72 Atl. 150; 72 N. Y. 286; 80 N. Y. 162; 74 Fed. 1000; 46 L. R. A.

734; 15 S. E. 888; 17 N. E. 496; 26 Mo. App. 129; 72 N. Y. 286; 107 Ark. 232; 170 U. S. 133.

5. Instruction No. 5 for appellee was correct and properly given. Ratification of unauthorized acts of an agent must be with full knowledge. 11 Ark. 189; 76 *Id.* 563; 64 *Id.* 217; 97 *Id.* 43; 90 *Id.* 104; 82 *Id.* 367; 15 *Id.* 55; 117 U. S. 96.

6. There was no ratification and no account stated. There is no error in the other instructions. 141 Fed. 538; 57 Hun. (N. Y.) 72; 38 N. Y. S. 580; 58 Ark. 129; 120 *Id.* 178.

SMITH, J. This appeal is prosecuted from a judgment of the court rendered in a cause wherein two cases were consolidated and tried together. Both suits were against the appellant, Citizens Bank & Trust Company, hereinafter referred to as the bank. Mrs. Ida L. Erwin was the plaintiff in one of these suits and the administrator of her husband's estate was the plaintiff in the other. It was alleged by Mrs. Erwin that on January 10, 1913, she deposited with the bank to her credit the sum of $30,779.18, and thereafter, up to and including November 11, 1914, made sundry deposits aggregating $45,821.93, so that her total deposits between those dates amounted to $76,601.11, which deposits were made subject to the rules controlling general deposits, and that the sum of $61,061.55 had been paid her, leaving a balance of $15,539.56, for which she had made demand but the bank had refused to pay.

In the complaint filed by the administrator of W. J. Erwin's estate it was alleged that plaintiff's intestate carried an account with the bank as a general depositor and subject to the rules controlling general deposits. That at the close of business on January 9, 1913, there was on deposit to the credit of his account the sum of $33,879.18, and the bank was indebted to Erwin in that sum, and on the next day Erwin drew a check for $30,779.18 in favor of his wife, and at the time there was another outstanding check, which was subsequently cashed by the bank, in the sum of $600, and no other

checks had been drawn against said account and there was, therefore, to the credit of this account the sum of $2,500, for which a demand had been made and payment refused.

In defense of Mrs. Erwin's suit the bank denied that only the sum of $61,061.55 had been withdrawn, alleging the fact to be that the entire deposit had been withdrawn by her and by her duly authorized agents and attorneys. Further answering, the bank alleged that at stated intervals between the dates mentioned in her complaint, statements of the account had been rendered with balances and pass books, at which times the cancelled checks and vouchers were returned and the pass books showed at such times the true and correct balances to her credit, and no objection was made thereto for nearly a year after the rendition of the last of such statements. Whereby the bank says Mrs. Erwin is now estopped to dispute such statements.

In answer to the complaint filed by the administrator, the bank alleged that Major Erwin's account was closed on January 10, 1913, at which time he and his duly authorized agent withdrew all of said funds from the bank, and said account was closed, and thereafter statements were rendered to him showing that it had been closed, and no objections to such statements were made from that date until the date of his death on October 22, 1914. It was further alleged that on January 10, 1913, Major Erwin was president of the bank, and continued as such until the date of his death. That as president he was charged with the duty to investigate his account and to determine the correctness thereof, and to report any irregularity to the board of directors. Wherefore, it is said that, because of the failure to perform his duty as president, and because of his failure to complain of the erroneous statement of his account as a depositor, his administrator is now estopped from the prosecution of a suit to recover an alleged balance.

Major Erwin was a man of large wealth and had extensive interests, but he had grown old and feeble, and on January 6, 1913, being then in his 81st year, he

had a stroke of paralysis, from which he never recovered. This event marked the close of his business career, and such attention as he thereafter gave to his business was in the collecting together of the odds and ends of his holdings. He had numerous loans but thereafter made no new ones, and as the old loans matured and were collected the proceeds were deposited to the credit of his wife's account with the bank.

In a conference with Paxton Thomas, who was the cashier of the bank, Major Erwin determined to transfer to his wife the balance to his credit in the bank, and, to accomplish this end signed a check drawn in blank as to the amount, payable to the order of his wife. This check was delivered to Thomas with directions to fill in the amount of the balance on hand, less certain checks known to be outstanding, but Thomas filled in this check for $2,500.00 less than this balance, and credited this difference to his individual account. This transaction closed the account of Major Erwin at the bank, and thereafter no checks were drawn in his name, and no subsequent deposits were made to his credit.

Notwithstanding the allegation of the answer to that effect, there is no proof that Major Erwin's pass book was ever balanced after he drew the check to his wife, nor is there any showing that this check was ever returned to him; but, upon the contrary, other checks drawn by Major Erwin were found in the compartment of the bank's vault where cancelled checks were kept until the pass books of the drawers of the checks were balanced, and the checks so found were ones which would have been included in a final balancing of this account.

There was no showing that Major Erwin had any duties to perform as president except such as are ordinarily performed by a bank president. On the contrary, it affirmatively appears there was an auditing committee whose business it was to exercise a general supervision of the bank's books, and to make regular examination of them every two or three months, and to examine generally into the accounts and condition of the bank; but

this committee was not required to go into a personal investigation of any individual accounts.

It is also undisputed that after his stroke Major Erwin did not undertake to discharge any of the duties of president, and on only a very few occasions did he ever visit the bank, and the duties of president were discharged by other persons. Thomas, the bank's cashier, was a trusted friend and agent of the Erwins, and their confidence in him appears to have been unlimited. It is shown that he signed the name of Major Erwin to many checks against that account before it was closed, and that he continued this practice in the name of Mrs. Erwin after the account had been opened in her name. Indeed, Mrs. Erwin admitted that all the checks and charges against her account which represented many transactions had by Thomas were either authorized by her or were for her benefit, except items amounting to $15,000.00. This sum was covered by five transactions, two of which were checks signed in her name by Thomas, dated May 7, 1913, and September 18, 1913, and for $2,500 and $1,500, respectively. Two other items were charge tickets dated August 14, 1914, and August 25, 1914, for the sums of $2,000.00 and $5,500.00, respectively. These charge tickets purported to be loans made Thomas, and charge tickets for those amounts were found in the vaults of the bank. But neither check nor charge ticket was found to cover an item of $3,500.00 dated January 6, 1914. Appellees contend that all of these items were credited by Thomas to his individual account and there was proof tending to support that contention.

The evidence is undisputed that Thomas did not have the authority to credit his account with the $2,500 taken from the account of Major Erwin; nor did he have any authority from Mrs. Erwin to sign her name to the checks to his order involved in this litigation, and the evidence shows that she did not make him any loan. The extent of his authority was to draw checks for Mrs. Erwin's benefit, and none of the items making up the $15,000.00 in dispute were for her benefit.

Mrs. Erwin's pass book was twice balanced, and the first balancing covered the first half of the year 1913, and she testified that the cancelled checks during that period corresponded with her pass book.  And she testified that there was no entry of the item of $2,500.00 charged on the books of the bank under date of May 7, 1913, in her pass book, nor any voucher of any kind showing that item, as they were not making any new loans and she would have been very much startled to have found any such charge.  She had preserved her cancelled checks during this period, including one for $133.80, covering fencing district taxes under date of May 7, but there was not found any other check of that date nor any check for $2,500.00 of any date.

Later she again left her book to be balanced, and after waiting some time she called on Thomas for the book, but was told by him that the book had been misplaced and it was never returned to her.  Thomas then furnished Mrs. Erwin with a second book which contained a statement of her account from January 7, 1914, to June 5, 1914, thus leaving a period of several months of which she had no statement of the account.  Within this period for which no statement was furnished were the items dated September 18, 1913, for $1,500.00, and the one for $3,500.00 dated January 6, 1914.  She testified that when Thomas gave her this second book he said, "I made up your book from the first of the year," and while she had never heard of an occurrence just like this it did not occur to her that there was anything wrong about the transaction, and that her suspicions were not aroused, as the checks which were delivered to her corresponded with the charges against her in her pass book, and that there was no balancing of her book during the period which would have covered the alleged loans of $2,000 and $5,500 under date of August 4, 1914, and August 25, 1914, respectively.

Kennerly, who was an employee of the bank during the time Thomas was its cashier and succeeded Thomas in that capacity, testified that he balanced Mrs. Erwin's pass book on June 5, 1914, and that it was balanced

again on January 5, 1915, at which time a check was drawn by Mrs. Erwin for the amount then on deposit to her credit and the account was converted into a time deposit and a certificate of deposit was issued for the amount shown by the bank's books to be then on hand.

(1)    After the death of Major Erwin his estate became involved in litigation over its distribution, and inquiry was made into the state of these accounts. Officers of the bank began to suspect Thomas' peculations, and when Thomas was called upon for a statement of these accounts he went to work, ostensibly, to comply with this demand, and some time during the night, while he was supposed to be thus employed, he committed suicide in the vault of the bank. It is suggested that he spent the time in the bank destroying evidences of his wrongdoing and that much of the uncertainty about the facts of this case grow out of the destruction by him of this evidence. After Thomas' death and after Mrs. Erwin's attorney had received from her her new pass book with the cancelled checks for the period from January 7, 1914, to June 5, 1914, these attorneys had the bank make a complete statement of this account, and that statement showed all the items involved in this controversy. This statement was furnished in the latter part of February, and these suits were begun on September 25, 1915. Thomas' death occurred on January 20, 1915, and letters of administration were taken out on his estate on February 1, 1915, and there is proof on the part of the bank to the effect that it was not advised that it would be held responsible for the full amount of Thomas' peculations until two days before the expiration of six months after the grant of letters of administration on Thomas' estate. Mrs. Erwin removed to Tennessee after the death of her husband and has since continued her residence there, and there is no proof of any acquiescence on her part in the correctness of the statement of her account as furnished her attorneys nor by the attorneys themselves after a conference between them and their client had revealed the improper charges which had been made

against the account.  While these suits were not brought against the bank until September 25, 1915, the undisputed proof is that a conference of Mrs. Erwin's attorneys was held in the latter part of February, 1915, at which Charles F. Cole, who was a director and the general attorney for the bank and a member of its auditing committee, was present, at which time these discrepancies were discussed, and while there is some difference as to what was said in regard to the extent of the bank's liability, there is no dispute that the correctness of the account was then challenged; and we think it should be said as a matter of law that no such time had elapsed between the date when the full statement of Mrs. Erwin's account was furnished her attorneys and the date when the bank's attorney was notified that this account was not correct as made the statement so furnished an account stated.

In 1 Ruling Case Law, p. 211 it is said: "An account stated presupposes an absolute acknowledgment or admission of a certain sum due, or an adjustment of accounts between the parties, the striking of a balance, or an assent express or implied, to the correctness of the balance.  If the acknowledgment or admission is qualified and not absolute, or if there is but an admission that something is due, without specifying how much, there is no account stated, nor does an account stated exist if there is but a partial settlement of accounts, without arriving at a balance, or if there is a dissent from the balance as struck."  The essentials of an account stated are lacking here.  The bank officers themselves had become suspicious of Thomas, and the verification of these suspicions caused the suicide, and so far as the Erwin account is concerned his suicide was not only his expiation but it was his confession.

The demand of the attorneys for a statement of the account was made after the suicide, and the demand was not merely that a pass book be balanced from the exact date on which it had been previously balanced, but that a statement of the entire account be furnished and the significance and purpose of this demand could

not have been unknown to the bank under the circumstances. Moreover the proof is undisputed that, before the expiration of the month in which the demand was made, actual notice was given to the attorney for the bank that the account was not correct.

Proper instructions submitted to the jury the question of Thomas' agency and authority, and that question may be said to be concluded by the verdict of the jury.

The pivotal instruction in the case so far as the suit of Mrs. Erwin is concerned was instruction No. 5, given at the instance of the plaintiff, and this instruction reads as follows:

"You are instructed that if you find Paxton Thomas, as cashier of the bank, transferred amounts from the account of Ida L. Erwin without her authority to his individual account, and caused entries to be made on the books of the bank by virtue of authority of charge tickets made by himself, which operated to transfer the amounts to his credit, and that charge tickets as used by said Paxton Thomas in said transactions could only be made by an officer or agent of the bank, and that by this system the said Paxton Thomas appropriated amounts to his own use, then you are instructed that as between the bank and Ida L. Erwin, the bank would be liable for such charges made to her account, unless with knowledge of said improper charges she has, by silence, ratified and adopted the same as proper charges, or having received a statement from the bank with vouchers representing such charges, and she upon receiving them did not in a reasonable time notify the bank that they were improper, and the bank was injured by her failure to so notify it."

The objection made to this instruction is the employment of the phrase, "with knowledge of said improper charges."

The theory of the bank was, and is, that, even though Thomas had no authority to divert the deposits of the Erwins, yet statements of the accounts showing

that this had been done were furnished, and that these statements became accounts stated.

Discussing this question the Supreme Court of the United States, in the case of *Leather Manufacturer's Bank* v. *Morgan et al.*, 117 U. S. 96, said: "While it is true that the relation of a bank and its depositor is one simply of debtor and creditor (*Phoenix Bank* v. *Risley*, 111 U. S. 125, 127), and that the depositor is not chargeable with any payments except such as are made in conformity with his orders, it is within common knowledge that the object of a pass book is to inform the depositor from time to time of the condition of his account as it appears upon the books of the bank. It not only enables him to discover errors to his prejudice, but supplies evidence in his favor in the event of litigation or dispute with the bank. In this way it operates to protect him against the carelessness or fraud of the bank. The sending of his pass book to be written up and returned with the vouchers is, therefore, in effect, a demand to know what the bank claims to be the state of his account. And the return of the book, with the vouchers, is the answer to that demand, and in effect imports a request by the bank that the depositor will, in proper time, examine the account so rendered, and either sanction or repudiate it."

And further in the same opinion it was said:

"It seems to us that if the case had been submitted to the jury, and they had found such negligence upon the part of the depositor as precluded him from disputing the correctness of the account rendered by the bank, the verdict could not have been set aside as wholly unsupported by the evidence. In their relations with depositors, banks are held, as they ought to be, to rigid responsibility. But the principles governing these relations ought not to be so extended as to invite or encourage such negligence by depositors in the examination of their bank accounts as is inconsistent with the relations of the parties or with those established rules and usages sanctioned by business men of ordinary

prudence and sagacity, which are or ought to be known to depositors. * * *

"While no rule can be laid down that will cover every transaction between a bank and its depositor, it is sufficient to say that the latter's duty is discharged when he exercises such diligence as is required by the circumstances of the particular case, including the relations of the parties, and the established or known usages of banking business."

(2-4)   We think this is the true rule to apply between a bank and its depositor, as we have held that relation to be one of debtor and creditor. *State Nat. Bank* v. *First Nat. Bank*, 124 Ark. 531; 187 S. W. 674. Notwithstanding the fact, however, that we now hold that the pass book of a depositor, when balanced and returned, may become an account stated and binding upon both the bank and the depositor as such, yet we think the instruction given was a correct declaration of the law as applied to the facts of this case. This instruction dealt both with the questions of ratification or estoppel and also with the duty of a depositor to examine statements of his account and to report any improper charges within a reasonable time. Having shown that there was no evidence that Mrs. Erwin had been furnished a statement of the account showing these charges there could be no objection to saying that she must have had knowledge of them to have ratified them. Certainly she could not ratify the unauthorized act until she had knowledge of that act, or was furnished the means of obtaining that knowledge.

Mrs. Erwin had the right to suppose that her accounts were being correctly kept; and while it was her duty to examine her pass book and to make complaint to the bank, if her pass book furnished her with the notice that improper charges had been made against her account, yet she was under no duty to take any action until she had this information.

(5)   We think no different rule is to be applied to Major Erwin's account. It is true that he had been the acting president of the bank prior to his stroke of

paralysis and remained as the nominal president until the time of his death on October 22, 1914, and it was known to every one connected with the bank in any capacity that he was not undertaking to discharge any of the functions of that office. This record does not present the question of the bank's liability to one who dealt with it on the faith of the fact that Erwin was being held out as president. In such event the president might incur a liability from the fact that he was the nominal president, although he discharged none of the duties of that office. This case presents the question of the bank's liability to one of its depositors who was its president. There is nothing in this record to show that Major Erwin was under any duty to make any examination as president of the bank of his own or any other account, and in the absence of such duty he is entitled to the same rights and protection in his individual deposit as the law accords to other depositors.

3 R. C. L., p. 440, Sec. 66, in the article on the subject of Banks, defines the duty of president as follows:

" * * * The president is but the executive agent of the board of directors, to perform such duties as may be devolved upon him; he is not the corporation, and cannot take the place of the governing board, and make contracts or incur liabilities outside of the ordinary business of the bank, without special authority. Ordinarily the cashier of a bank is its managing officer, and the powers of the president as such are very limited, save as conferred on him by the board of directors. Special powers may, of course, be conferred upon the president; and where he acts with the knowledge and consent of the bank in a particular matter his authority to do so cannot be denied. * * * The president usually presides at the meetings of the board of directors, and being a member of the board of directors he is, in the absence of that body, entrusted with the general supervision of the concerns of the bank. * * *

In Section 71 of the same text, page 444, the duties of the cashier are defined as follows:

"* * * The cashier's ordinary duties are to keep all the funds of the bank, its notes, bills, and other choses in action, to be used from time to time for the ordinary and extraordinary exigencies of the bank. He usually receives, directly or through subordinate officers, all moneys and notes of the bank, delivers up all discounted notes and securities when they have been paid, draws checks to withdraw the funds of the bank where they have been deposited, and as the executive officer of the bank transacts most of its business."

The proof here does not show that any charge ticket or pass book was ever returned to Major Erwin, and he was not, therefore, ever advised or furnished the means of knowing that the item of $2,500.00 had been subtracted from his balance.

The court gave at appellant's request an instruction to the effect that a delivery of cancelled checks and vouchers of a depositor to an attorney of such depositor was equivalent to a delivery to the depositor, and that when so delivered it became the duty of the depositor or her attorney to inspect the same within a reasonable time and to make complaint of any error; but it is said that other instructions on the same subject were in conflict with it. Even though this were true, such error would not call for the reversal of the case. Having held as a matter of law that the account did not become an account stated through the statement furnished the attorneys for Mrs. Erwin, no prejudice could result if the instructions did not correctly declare the law upon a subject which did not constitute a defense.

Exceptions were saved to the action of the court in giving and refusing other instructions; but we think the views we have here expressed render it unnecessary to discuss these instructions.

Finding no prejudicial error the judgments are affirmed.